# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

PAUL SALGADO,                           )
                                        )
        Petitioner,          )
                                        )
        vs.                  )        **Case No. 17 C 4200**
                                        )
MICHAEL MELVIN, Warden,                 )
                                        )
        Respondent.          )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After a bench trial in the Circuit Court of Cook County, Paul Salgado was convicted of the first degree murder of Julio Rodarte. The trial judge sentenced him to a term of imprisonment of fifty-five years, which included a mandatory sentence enhancement of twenty-five years for personally discharging the firearm that caused Rodarte's death. *See* 730 ILCS 5/5-8-1(a)(1)(d)(iii). Salgado has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief on five grounds: (1) his confessions were obtained in violation of *Miranda* after he invoked his right to counsel, (2) the delay in bringing him before a judge for a probable cause determination violated his Fourth Amendment rights and rendered his confessions involuntary under the Fifth Amendment, (3) the twenty-five year firearm sentencing enhancement is unconstitutional, (4) trial counsel rendered ineffective assistance by relying on an unavailable voluntary intoxication defense at trial and appellate counsel was ineffective for failing to raise this issue on appeal, and (5) his confessions were not sufficiently

attenuated from his illegal arrest to be admissible against him at trial. For the reasons stated below, the Court denies Salgado's petition.

**Background**

## A.      Factual background

The following background information is taken from the Illinois Appellate Court's three opinions in Salgado's case, as well as from the record of proceedings in state court.

Salgado spent the evening of January 28, 2000—and into the early morning of January 29—driving around Chicago with fellow gang members Francisco Navarro and Julio Rodarte in Navarro's SUV, drinking and using drugs. At some point, Navarro pulled into an alley so they could urinate. Salgado exited the car and told Rodarte to get out too. When Rodarte did so, Salgado shot him several times at close range.

On the evening of February 3, 2000, both Salgado and Navarro were brought to the police station in connection with the murder. Upon initial questioning by Detective Zalatoris, Salgado denied involvement in the murder. At 2:00 a.m. on February 4, Navarro told police that he saw Salgado shoot Rodarte. Salgado was officially placed under arrest that morning. An attorney spoke with Salgado at the police station between 9:00 a.m. and 10:00 a.m. on February 4 and informed him that he was charged with first degree murder based on Navarro's statement. Before leaving the station, the attorney told Zalatoris that Salgado did not want to speak further with police, gave Zalatoris his business card, and asked to be called if the detectives needed to speak to Salgado. Zalatoris testified that he left for the day without speaking to Salgado again.

Around 9:00 a.m. on February 5, Zalatoris testified that he checked in on

Salgado, who was still being held at the station, to see if he wanted cigarettes or anything to drink. Zalatoris testified that Salgado said he wanted a pop and then asked Zalatoris if he could talk to him for a second. Zalatoris reminded him that he had a lawyer and that he did not need to talk to the police, but Salgado stated that he wanted to tell Zalatoris "what went down." Apr. 12, 2002 Hr'g Tr. 8:17-8:18 (dkt. no. 9-2). Zalatoris testified that he read *Miranda* warnings to Salgado and told him he could have his attorney present. Salgado indicated that he understood his rights, and during the subsequent interview with Zalatoris and another detective, Detective Lewis, he confessed to the murder. At 5:00 p.m. that same day, after another round of *Miranda* warnings, Salgado confessed again, this time to the assistant state's attorney. At 7:55 p.m., after signing a waiver giving up his right to have an attorney present, Salgado gave a videotaped statement, in which he again admitted to shooting and killing Rodarte.[1] Salgado did not receive a probable cause hearing until Monday, February 7.

## B.    Procedural background

### 1.    Proceedings before the trial court

Before trial, Salgado moved to quash his arrest and suppress evidence, including his statements to law enforcement, on the ground that he was detained at the police station without probable cause in violation of his Fourth Amendment rights. He also moved to suppress the statements he made on February 5 on the ground that they were

---

[1] Salgado testified to a different version of events. He alleged that on February 4, after his attorney left, the detectives entered the interview room, handcuffed him to the wall, hit him, and interrogated him about the murder. He further testified that he confessed on February 5 only after one of the detectives promised him that they would reduce the charges against him to second degree murder. At the suppression hearing, the trial court found Zalatoris's testimony credible, and it determined that Salgado's testimony regarding his treatment by the officers was "not . . . credible at all." July 18, 2002 Hr'g Tr. A-19:15 (dkt. no. 9-4).

involuntary and obtained in violation of *Miranda*. After two evidentiary hearings, the trial court denied both motions. In denying the motion to quash arrest, the trial court noted that Navarro's 2:00 a.m. statement on February 4 provided probable cause for Salgado's arrest and that he was only detained at the station for a short time before probable cause existed. *See* Dec. 18, 2001 Hr'g Tr. at E-8 (dkt. no. 9-3). The trial court concluded that Salgado's statements to police on February 5 were admissible because he made them after he reinitiated conversation with Zalatoris and knowingly and voluntarily waived his *Miranda* rights after again being advised of them. *See* July 18, 2002 Hr'g Tr. at A-19 (dkt. no. 9-4).

One month before trial, Salgado's attorney informed the court and the prosecution that he planned to assert a voluntary intoxication defense. One day before trial, the prosecution dismissed the three counts of intentional murder, which were the only charges that required proof of specific intent and thus would have been subject to a voluntary intoxication defense. At trial, the prosecution presented the testimony of Navarro, the assistant state's attorney, and Zalatoris. Their testimony was generally consistent with Salgado's videotaped confession—which also was admitted into evidence—and the testimony presented during the pre-trial evidentiary hearings. Salgado did not present any witnesses. In closing argument, his attorney argued that the offense should be reduced to second degree murder based on the evidence that he was drunk and acting "crazy" at the time of the shooting. Trial Tr. I-50:23 (dkt. no. 9-5). At the conclusion of the bench trial, the trial judge found Salgado guilty of three counts of general intent first degree murder, based on a finding that the prosecution had proven "beyond a reasonable doubt that without lawful justification, he shot and killed Julio

Rodarte knowing that such acts created a strong probability of death or great bodily harm to the victim, and during the commission of the offense, he personally discharged a firearm that proximately caused his death." *Id.* at I-62:15-I-62:21. In reaching this conclusion, the trial court acknowledged the testimony that Salgado had been drinking on the night of the shooting but concluded that alcohol had a "minimal" influence on Salgado's actions that night. *Id.* at I-62:12.

## 2. Direct appeal

Salgado asserted the following claims on appeal: (1) he was detained without probable cause in violation of the Fourth Amendment, (2) his confessions were obtained in violation of *Miranda* and *Edwards v. Arizona*, 451 U.S. 477 (1981), (3) police unreasonably delayed bringing him before a judge for a probable cause hearing in violation of *Gerstein v. Pugh*, 420 U.S. 103 (1975), (4) the prosecution improperly dismissed the specific intent murder charges before trial for the purpose of preventing him from raising a voluntary intoxication defense, and (5) the twenty-five year sentencing enhancement is unconstitutional.

In a July 2006 decision, the appellate court concluded that Salgado's detention at the police station became unlawful around midnight on February 4, after he denied involvement in the murder but before Navarro made the 2:00 a.m. statement that provided probable cause for his arrest. Because the court could not determine from the record whether the statements Salgado gave after his illegal arrest were sufficiently attenuated from his illegal detention to render them admissible, it vacated Salgado's conviction and remanded to the trial court with directions to conduct an attenuation hearing. *See People v. Salgado*, No. 1-03-1753, at 19-20 (Ill. App. Ct. July 14, 2006)

(unpublished order) (dkt. no. 9-16). The appellate court went on to reject Salgado's other four claims. Specifically, the court held that Salgado's confessions were not obtained in violation of *Edwards* because, after invoking his right to counsel, he reinitiated communication with police and knowingly and intelligently waived his right to counsel prior to further questioning. The court also rejected Salgado's challenges to the firearm enhancement and to the state's last-minute dismissal of the intentional murder charges. Lastly, the court explained that the *Gerstein* violation would not by itself justify suppression of Salgado's confessions; the confessions would be subject to suppression only if they were shown to be involuntary. In this case, the appellate court concluded that the trial court's determination that Salgado's statements were voluntary was not against the manifest weight of the evidence.

In August 2008, the trial court held an evidentiary hearing on the issue of attenuation. The prosecution called Detectives Zalatoris and Lewis as witnesses, and Navarro testified for the defense. In September 2008, after reviewing the testimony from all the prior evidentiary hearings and from the trial itself, the trial court concluded, based on the totality of the evidence and its assessment of the witnesses' credibility, that Salgado's statements were sufficiently attenuated from his illegal arrest to be admissible. The trial court rejected Salgado's argument that Navarro's statement was illegally obtained and thus could not serve as probable cause to attenuate Salgado's own statements from his illegal arrest. The trial court found that, although Navarro was at the police station for a long time, he was never arrested or in custody but rather he was treated as a witness. Sept. 18, 2008 Hr'g Tr. 34:18-34:24 (dkt. no. 9-10). Accordingly, the trial court concluded that Navarro's statement implicating Salgado in

the murder was a legitimate intervening circumstance that served to attenuate Salgado's confession from his illegal detention by providing probable cause for his arrest. The trial court reinstated Salgado's conviction and sentence, and he timely appealed.

In a 2009 decision affirming Salgado's conviction, the appellate court expressly rejected the contention that Navarro's statement could not serve as an intervening circumstance because it was illegally obtained. Although the appellate court agreed that "the circumstances surrounding Navarro's detention were very similar to those surrounding the detention" of Salgado, it concluded, based on the totality of the circumstances, that Navarro was merely a witness cooperating with police when he gave his statement, even though Navarro himself testified that he did not feel free to leave the station. *See People v. Salgado*, 396 Ill. App. 3d 856, 862-63, 920 N.E.2d 1194, 1200-01 (2009). The Illinois Supreme Court denied Salgado's timely petition for leave to appeal in May 2010.

### 3.    Post-conviction proceedings

With the assistance of counsel, Salgado filed a petition for state post-conviction relief in January 2011. He then filed a *pro se* supplement to the petition—which his counsel later adopted—in which he argued, among other things, that his trial attorney rendered ineffective assistance by relying on a legally unavailable voluntary intoxication defense and that his appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. The trial court dismissed the petition in September 2013, and the appellate court affirmed in September 2016. The Illinois Supreme Court denied Salgado's petition for leave to appeal in January 2017.

**4.     Habeas corpus petition**

Salgado filed the present petition for a writ of habeas corpus without the

assistance of counsel in June 2017.  He asserts five grounds for relief:

> 1) his confessions were obtained in violation of *Miranda* and *Edwards* after he
> invoked his right to counsel;
>
> 2) the delay in bringing him before a judge for a probable cause determination
> violated his Fourth Amendment rights and rendered his confessions involuntary
> under the Fifth Amendment;
>
> 3) the twenty-five year firearm sentence enhancement is unconstitutional;
>
> 4) trial counsel rendered ineffective assistance by relying on an unavailable
> voluntary intoxication defense at trial and appellate counsel was ineffective for
> failing to raise this issue on appeal; and
>
> 5) his confessions were inadmissible because they were not sufficiently
> attenuated from his illegal arrest.

Respondent contends that the Court may not grant relief on the first, third, and

fourth claims because the state appellate court's adjudication of those claims was not

contrary to or an unreasonable application of federal law.  Respondent further argues

that *Stone v. Powell*, 428 U.S. 465 (1976), bars relitigation of the second and fifth claims

because the state courts provided Salgado an opportunity to fully and fairly litigate those

Fourth Amendment issues.

**Discussion**

A state prisoner is entitled to a writ of habeas corpus "only on the ground that he

is in custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).

**A.     Claims one, three, and four**

When a state court has adjudicated a petitioner's claim on the merits, a writ of

habeas corpus may issue only if the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)-(2). A state court's decision is "contrary to" clearly established federal law if the state court applies a rule that contradicts the governing Supreme Court precedent or if it reaches an outcome inconsistent with a Supreme Court decision in a case with materially indistinguishable facts. *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008). A state court decision is "unreasonable" under section 2254(d)(1) "if the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." *Moseley v. Kemper*, 860 F.3d 1020, 1024 (7th Cir. 2017), *cert. denied*, No. 17-6947, 2018 WL 311782 (U.S. Jan. 8, 2018) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)) (alterations in original). To prevail on a claim that a state court decision was based on an unreasonable determination of the facts under section 2254(d)(2), a prisoner must show that the state court committed an unreasonable error that lies against the clear weight of the evidence. *Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011).

On habeas corpus review, the federal courts look to "the decision of the last state court to rule on the merits of the petitioner's claim." *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013) (citation omitted). For Salgado's first claim—that his confessions were obtained in violation of *Miranda* and *Edwards* after he invoked his right to counsel—the relevant decision is the Illinois Appellate Court's 2006 opinion, *People v.*

9

*Salgado*, No. 1-03-1753. The same is true for Salgado's challenge to the constitutionality of his twenty-five year firearm sentence enhancement. With respect to Salgado's ineffective assistance claims, the Court looks to the Illinois Appellate Court's 2016 decision affirming the denial of his post-conviction petition. *See People v. Salgado*, 2016 IL App (1st) 133102, 63 N.E.3d 268, *leave to appeal denied,* 77 N.E.3d 85 (Ill. 2017).

### 1. Claim one: *Miranda/Edwards*

The Supreme Court held in *Edwards v. Arizona* that after a suspect "has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. Instead, once an accused has invoked his *Miranda* right to counsel, he is not subject to further interrogation in the absence of his attorney "unless [he] himself initiates further communication, exchanges, or conversations with the police" and knowingly and intelligently waives his right to counsel. *Id.* at 484-85, 486 n.9; *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (plurality opinion) (waiver of right to counsel after invocation of that right must be knowing and intelligent).

Salgado does not frame his argument in the terms of the applicable section 2254(d) standards. Instead, he contends that the appellate court erred as a matter of law and fact in concluding that he reinitiated dialogue with police after asserting his *Miranda* right to counsel and that his subsequent statements should have been suppressed. More specifically, Salgado argues that, because the prosecution did not videotape his purported "reinitiation" of dialogue with Zalatoris on February 5 or later

ask Salgado to confirm, on tape, that he was the one who initiated further communication with Zalatoris, it failed to meet its burden to show that he was the one who actually initiated further communication. Salgado relatedly contends that the appellate court failed to determine that he made a statement that "evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045-46.

The appellate court correctly identified *Edwards* as the controlling Supreme Court precedent, explaining that, "[w]hen an accused invokes the right to counsel, any interrogation must cease until counsel is made available, unless the accused initiates further communication with police." *Salgado*, No. 1-03-1753, at 20. The court then reviewed the conflicting testimony of Zalatoris and Salgado regarding their interactions on the morning of February 5 in great detail. The court noted that the trial court found Salgado's testimony on the subject not credible; by contrast, it found credible Zalatoris's testimony that Salgado told him "I want to tell you what went down." In light of that testimony, the appellate court concluded that the record demonstrated that Salgado evinced a desire to talk generally about the investigation and thus reinitiated conversation with police.

Consistent with *Edwards*, the appellate court then went on to evaluate whether Salgado's subsequent waiver of his right to counsel was knowing and intelligent. First, the court observed that Zalatoris responded to Salgado's reinitiation of dialogue by reading him *Miranda* warnings. The court acknowledged that the assistant state's attorney did not question Salgado on videotape about whether he or Zalatoris initiated further communication on the morning of February 5. Nonetheless, the court found it

more significant that, after the assistant state's attorney gave him additional *Miranda* warnings, Salgado stated on tape that he understood his rights, he had met with his attorney privately the previous day, and he knew his attorney was not present for the videotaping. The court found that the record rebutted Salgado's claims of physical or mental coercion and that the guilt and remorse that he expressed during his statements on February 5 were the actual impetus for his confession. The court ultimately determined, based on the totality of the circumstances, that there was sufficient evidence to conclude that the prosecution had met its burden to show that Salgado's waiver of his right to counsel was knowing, intelligent, and voluntary.

The appellate court's decision was not "contrary to" or an unreasonable application of clearly established federal law. Salgado repeatedly cites *Oregon v. Bradshaw* for the proposition that an accused must "evince[ ] a willingness and a desire for a generalized discussion about the investigation" in order to be found to have initiated further communication with police. *Bradshaw*, 462 U.S. at 1045-46. In that case, a plurality of the Supreme Court concluded that an accused's question "Well, what is going to happen to me now?" evinced a desire for generalized discussion. *Id.* at 1045. The statement at issue in this case—"I want to tell you what went down"—is not nearly as close of a call.

Nor was the appellate court's decision based on an unreasonable determination of the facts in light of the evidence presented. The court acknowledged that Salgado testified that he did not reinitiate conversation with Zalatoris and was instead physically assaulted and coerced into confessing, but it discounted Salgado's testimony because the trial court found it was not credible. The appellate court further noted that additional

testimony by Zalatoris and Lewis suggested that Salgado was moved to reinitiate dialogue with Zalatoris and confess not because he was coerced, but because he felt sorry about what he had done. On this record, it cannot be said that the appellate court's adoption of the trial court's fact and credibility findings was against the clear weight of the evidence. Because the Illinois Appellate Court's decision was neither contrary to nor an unreasonable application of clearly established federal law and because there is no basis to conclude that its decision rested on an unreasonable factual determination, Salgado is not entitled to relief on this claim.

**2.      Claim three: firearm enhancement**

The Supreme Court held in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that any fact, other than the fact of a prior conviction, which increases the penalty for an offense beyond the statutory maximum "must be submitted to a jury, and proved beyond a reasonable doubt." Under Illinois law, defendants who are found to have personally discharged a firearm that caused the death of another person during the commission of an offense receive a mandatory sentence enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) ("[I]f, during the commission of the offense, the person personally discharged a firearm that proximately caused . . . death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court.").

Salgado argues that this mandatory enhancement is facially unconstitutional under *Apprendi* because it does not provide for a jury trial in which the prosecution is required to prove the necessary facts beyond a reasonable doubt. In his reply brief, Salgado also alludes to an argument that the enhancement violates the one act-one crime rule, which protects defendants from being convicted of more than one offense

based on a single physical act. Because the one act-one crime rule is a state law principle, however, this claim is not cognizable on federal habeas corpus review. *See Young v. Varga*, No. 16 C 3386, 2017 WL 386655, at *4 (N.D. Ill. Jan. 27, 2017).

As for Salgado's *Apprendi* challenge to the firearm enhancement, the Illinois Appellate Court considered and rejected it on the merits in its 2006 opinion. The court explained that this particular sentencing enhancement "is applied only if the defendant is found guilty beyond a reasonable doubt of committing murder with a firearm." *Salgado*, No. 1-03-1753, at 42. In this case, the court noted, the sixth count of the indictment specifically charged Salgado with personally discharging a firearm that proximately caused Rodarte's death. More importantly, Salgado waived his right to a jury trial and, at the close of the bench trial, the trial judge expressly found that the state had proven beyond a reasonable doubt that Salgado "shot and killed Julio Rodarte knowing that such acts created a strong probability of death or great bodily harm to the victim, *and during the commission of the offense, he personally discharged a firearm that proximately caused his death*." *Id.* at 43 (emphasis added). On that basis, the appellate court concluded that the enhancement did not violate *Apprendi*.

The facts of *Apprendi* are markedly different from the facts of this case. After the defendant pled guilty to a number of charges, the trial judge held an evidentiary hearing on the defendant's "purpose" in committing the offense to determine the applicability of an enhancement that pertained to hate crimes. *Apprendi*, 530 U.S. at 470. The trial judge imposed the enhancement after finding "by a preponderance of the evidence" that the defendant's actions were taken with the requisite "purpose to intimidate." *Id.* at 471. In Salgado's case, by contrast, the trial judge specifically found *beyond a reasonable*

*doubt* that Salgado personally discharged a firearm that proximately caused Rodarte's death.  The Court therefore concludes that the appellate court's rejection of Salgado's challenge to the firearm enhancement was in no way contrary to or an unreasonable application of clearly established federal law.  *Cf. Jones v. Hulick*, 449 F.3d 784, 791 (7th Cir. 2006) (rejecting a defendant's *Apprendi* claim where he waived his right to a jury trial and the judge expressly found him guilty beyond a reasonable doubt of the act underlying the sentencing enhancement at issue).  Accordingly, Salgado is not entitled to relief based on this claim.

### 3. Claim four: ineffective assistance of counsel

To prevail on an ineffective assistance of counsel claim, a defendant must show that his attorney's performance "fell below an objective standard of reasonableness" and that he suffered prejudice as a result.  *Wyatt v. United States*, 574 F.3d 455, 457 (7th Cir. 2009) (quoting *Strickland v. Washington,* 466 U.S. 668, 688 (1984)).  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 458 (citation omitted).  A defendant will be found to have suffered prejudice only if he can demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Prejudice is presumed, however, in the extreme case in which counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 659 (1984).

Salgado contends that his trial attorney's decision to concede that Salgado shot Rodarte and rely on a voluntary intoxication defense even after the prosecution

dismissed the specific intent first degree murder charges constituted *per se* ineffective assistance, because voluntary intoxication was not a legally cognizable defense to the remaining general intent murder charges. In the alternative, he contends that his attorney's reliance on this defense satisfies both parts of the *Strickland* test for ineffective assistance. Salgado also contends that his appellate counsel was also ineffective for failing to raise this issue on direct appeal. The Illinois Appellate Court considered and rejected these arguments on the merits in its 2016 opinion affirming the trial court's dismissal of Salgado's post-conviction petition. As a result, Salgado's ineffective assistance claims may not form the basis for habeas corpus relief unless the state court's denial of these claims was contrary to—or involved an unreasonable application of—federal law or was based on an unreasonable factual determination.

As a preliminary matter, the appellate court's decision was not contrary to clearly established federal law. Not only did the court analyze Salgado's claim of ineffective assistance of trial counsel under *Strickland*'s two-part test, but it also considered, consistent with *Cronic*, whether his attorney entirely failed to subject the prosecution's case to meaningful adversarial testing such that prejudice should be presumed. The court concluded that the record refuted Salgado's claim that there was no meaningful adversarial testing. In support of its conclusion, the court pointed to trial counsel's filing and litigation of multiple suppression motions, his success in prompting the prosecution to drop the three specific intent murder charges, and his cross-examination of every witness presented at trial, among other efforts. The court concluded that trial counsel actually "attempted to address the overwhelming evidence of defendant's guilt in the most credible and reasonable manner possible" by asking for a finding of not guilty or, in

the alternative, a second degree murder finding. *Salgado*, 2016 IL App (1st) 133102, ¶ 38, 63 N.E.3d at 279. The court went on to reject Salgado's claim that his trial counsel's performance was deficient under the *Strickland* standard, based on its conclusion that trial counsel did not erroneously present an unavailable intoxication defense, but instead presented a defense theory "tantamount to passion." *Id.* ¶ 39, 63 N.E.3d at 279. The court characterized trial counsel's argument as a theory that "there was abundant evidence in mitigation to indicate that defendant should be found guilty of the reduced offense of second degree murder based on his mental state at the time of the shooting," and it determined that this was not an unreasonable trial strategy, given the facts of the case. *Id.* The court also determined that Salgado failed to show that he was prejudiced by this alleged error; in light of the overwhelming evidence of guilt presented at trial—including Salgado's own videotaped confession and Navarro's eyewitness testimony—the court concluded that Salgado was unable to show a reasonable probability that the outcome of the trial would have been different but for his attorney's alleged reliance on a voluntary intoxication defense. Having determined that Salgado's ineffective assistance of trial counsel claim lacked merit, the appellate court concluded that appellate counsel was not ineffective under *Strickland* for failing to raise the issue on direct appeal.

Because the appellate court's application of *Strickland* and *Cronic* to these claims was reasonable in light of the facts of this particular case, the Court overrules Salgado's ineffective assistance claims.

## B. Claims two and five

In *Stone v. Powell*, the Supreme Court sharply limited the circumstances under which a state prisoner may be granted habeas corpus relief on the ground that evidence

obtained in violation of his Fourth Amendment rights was used against him at trial. Specifically, *Stone v. Powell* held that where the state has provided "an opportunity for full and fair litigation of a Fourth Amendment claim," a federal court will not review that claim in a subsequent habeas corpus petition. *Stone*, 428 U.S. at 481-82; *Ben-Yisrayl*, 540 F.3d at 552. A prisoner received such an opportunity—and thus, his Fourth Amendment claim is barred from habeas corpus review—if he made the state court aware of the claim and the factual basis for that claim and the court "carefully and thoroughly analyzed the facts" and applied the correct constitutional case law to those facts. *Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005). The Seventh Circuit has explained that the *Stone v. Powell* standard does not guarantee a correct outcome on a defendant's Fourth Amendment claim; it aims to ensure only that the defendant had "an adequate opportunity to pursue the claim in the state court system." *Id.* at 998. To that end, a federal court's role on habeas review "is not to second-guess the state court on the merits of the petitioner's claim, but rather to assure [itself] that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe v. Davis*, 712 F.3d 1106, 1114 (7th Cir. 2013).

1. **Claim two: *Gerstein* violation**

In *Gerstein v. Pugh*, the Supreme Court held that the Fourth Amendment "requires a timely judicial determination of probable cause as a prerequisite to detention." *Gerstein*, 420 U.S. at 126. The Court elaborated on this requirement in *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991). A delay of 48 hours or less between arrest and probable cause determination is presumed constitutional, although the defendant may still be able to prove that the delay in his particular case was

unreasonable under the circumstances. *Id.* at 56. On the other hand, in cases in which a probable cause determination was not made until more than 48 hours after arrest, the government bears the burden of demonstrating the existence of "a bona fide emergency or other extraordinary circumstance" to justify the delay. *Id.* at 57.

Salgado did not receive a probable cause hearing until approximately 84 hours after he was arrested. *Salgado*, No. 1-03-1753, at 31. He contends that the statements he made in the interim, including his videotaped confession, should have been suppressed for two reasons. First, he argues that the remedy for this unreasonable delay between his arrest and the probable cause hearing "should be" suppression of the statements he made before the hearing. 2254 Mot. at 6. Second, he argues that this delay is one of the many factors that rendered his confessions involuntary under the Fifth Amendment. Respondent counters that this claim is barred because Salgado already had an opportunity for full and fair litigation in state court.

To the extent that Salgado's claim is based on the Fourth Amendment, the Court agrees that it is barred by *Stone v. Powell*. Salgado clearly presented his *Gerstein* claim—as well as the facts upon which it was based—to the state appellate court on direct appeal. In its 2006 decision, the Illinois Appellate Court carefully and thoroughly analyzed the circumstances surrounding the delay and Salgado's confession. Because the State provided no justification for the 84-hour delay between Salgado's arrest and the probable cause hearing, the court ultimately agreed that his detention ran afoul of *Gerstein* and *McLaughlin*. It declined to suppress his confession solely on that basis, however, in light of a recent Illinois Supreme Court case, *People v. Willis*, 215 Ill. 2d 517, 831 N.E.2d 531 (2005), which concluded that the admissibility of a confession

obtained during the course of *Gerstein*/*McLaughlin* violation turned on whether the confession was voluntary based on the totality of the circumstances (which would, of course, include the fact of the *Gerstein* violation). Salgado does not argue that the appellate court applied the wrong body of case law in reaching this conclusion—nor could he, given that the United States Supreme Court has never held that the remedy for a *Gerstein* violation is automatic suppression of a defendant's confession. *See, e.g.*, *Arnold v. Hutchinson*, No. 14 C 8501, 2017 WL 85444, at *12 (N.D. Ill. Jan. 10, 2017). Because there is no indication that Salgado was precluded from fully and fairly litigating this claim in state court, the Court concludes that Salgado's Fourth Amendment *Gerstein*/*McLaughlin* claim is barred under *Stone v. Powell*.

Salgado's related argument that the appellate court erred by failing to ascribe the appropriate weight to the *Gerstein* violation in assessing the overall voluntariness of his confession also fails, because the state court's decision on this matter was neither "contrary to" nor an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). Supreme Court case law clearly establishes that the voluntariness of a confession must be determined by considering the totality of the circumstances, and that is exactly how the appellate court evaluated Salgado's confession here. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). Factors considered by the court—in addition to the unreasonable delay in presentment—included Salgado's age, education, experience, physical condition at the time of detention and interrogation, the duration of the interrogation and detention, whether *Miranda* warnings were given, and whether he suffered any physical or mental abuse. Ultimately, the appellate court determined, as the Illinois Supreme Court had concluded in *Willis*, that despite the

*Gerstein/McLaughlin* violation, the totality of the circumstances indicated that the confession was voluntary and thus admissible. Salgado's argument that the court failed to ascribe the proper weight to the *Gerstein* violation is insufficient to warrant habeas corpus relief. *Cf. Johnson v. Jaimet*, 852 F.3d 700, 707 (7th Cir.), *reh'g denied* (May 16, 2017), *cert. denied,* 138 S. Ct. 168 (2017) (it is not the federal court's role on habeas corpus review to reweigh the facts in order to arrive at a different conclusion).

> **2.     Claim five: illegal arrest**

An individual has been seized within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citation omitted); *see also Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (internal quotation marks and citation omitted). A confession that is obtained subsequent to a defendant's illegal arrest or detention is not admissible against that defendant at trial unless the confession is determined to be sufficiently attenuated from the taint of that illegal arrest. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 488 (1963). In assessing the admissibility of a confession following an illegal arrest, a court must consider the following four factors: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the arrest and the confession, (3) the existence of intervening circumstances, and (4) the purpose and flagrancy of the police misconduct in that case, though no single factor is dispositive. *See Brown v. Illinois*, 422 U.S. 590, 603-04

(1975). The State bears the burden of demonstrating that a confession is sufficiently attenuated to be admissible. *Id.* at 604.

Salgado contends that he was deprived of an opportunity to fully and fairly litigate this claim because the state court's determination that his confession was sufficiently attenuated from his illegal arrest is contrary to *Brown v. Illinois.* The argument that Salgado actually makes, however, does not appear to be rooted in *Brown.* Instead, he contends that, because the circumstances of Navarro's detention were similar to his own, Navarro's statement was illegally obtained because it was the fruit of an illegal arrest. As such, he argues that Navarro's statement cannot serve as an intervening factor to attenuate Salgado's confession from his illegal arrest.

As previously noted, after the Illinois Appellate Court held in 2006 that Salgado's detention became illegal around midnight on February 4, it remanded the case to the trial court to hold an evidentiary hearing on the issue of whether Salgado's subsequent confession was admissible in light of his illegal arrest. At the August 2008 hearing, Salgado clearly informed the trial court of the factual basis for his claim that his confession was not sufficiently attenuated from his illegal arrest. He specifically argued before the trial court that, because Navarro had been illegally detained, his statement could not dissipate the taint of Salgado's own illegal arrest. At the close of the evidentiary hearing, the trial judge concluded that Navarro's statement served as an intervening factor because it provided probable cause for Salgado's arrest. In support of this conclusion, the trial court noted that, although Navarro was at the station for a long time, he was never in custody. He was never handcuffed, fingerprinted, or photographed, and he was always treated as a witness in the case. The trial judge then

went on to evaluate the other *Brown* factors. It found that the officers gave Salgado *Miranda* warnings, that approximately twenty-four hours[2] passed between the time when Navarro gave his statement—which was two hours after Salgado's detention became illegal—and Salgado's first confession, and that the officers' conduct "was in no way flagrant or inappropriate." Sept. 18, 2008 Hr'g Tr. 36:14-36:15 (dkt. no. 9-10). The trial judge therefore concluded that Salgado's confessions were sufficiently attenuated from his illegal arrest.

It is true, as Salgado points out, that the trial court did not attempt to reconcile its conclusion that Navarro's statement could serve as an intervening factor that provided probable cause for Salgado's arrest with Navarro's testimony at the hearing that he did not believe he was free to leave the police station and was not told that he could do so. The contention that the trial court got it wrong does not mean, however, that the court failed to carefully and thoroughly analyze the facts, thereby denying Salgado the opportunity to fully and fairly litigate his claim. *See, e.g.*, *Miranda*, 394 F.3d at 1001 ("[T]he question before us is not whether (in our view) the Illinois Appellate Court was right or wrong to find that Chavez was not under arrest, but whether that finding was so gravely mistaken, in view of the record evidence, as to suggest that the Illinois Appellate Court was unwilling to engage in a good faith review of Miranda's Fourth Amendment claim."). Because the constitutional standard for determining when a consensual encounter becomes an illegal detention is an objective one, viewed in the context of all

_____

[2] In reality, it was more than twenty-four hours, because Navarro gave his oral statement implicating Salgado at 2:00 a.m. on February 4, and Salgado did not make his first inculpatory statement until around 9:00 a.m. on February 5. And even more time than that elapsed between Salgado's illegal detention and his first inculpatory statement.

the surrounding circumstances, Navarro's subjective impressions do not control the analysis. Moreover, the trial court found that the other *Brown* factors also weighed in favor of finding attenuation. The trial court applied the correct constitutional test for attenuation in considering the *Brown* factors, it correctly considered the totality of the circumstances with respect to the question of whether Navarro was illegally detained, and there is no indication that the trial court failed to take this claim seriously. *Stone v. Powell* therefore precludes this court from reaching the merits on habeas corpus review.

Salgado's contention that he was precluded from fully and fairly litigating this claim on appeal likewise fails. He fully briefed this claim before the appellate court in April 2009. In its December 2009 opinion, the appellate court carefully and thoroughly reviewed the facts of the case, including the circumstances under which Navarro arrived at the police station and made the statement implicating Salgado. The court concluded that, "[b]ased on the totality of the circumstances, Navarro was not 'seized without probable cause,' but was a witness cooperating with the police when, at 2 a.m. on February 4, 2000, he identified Salgado as Julio Rodarte's murderer." *Salgado*, 396 Ill. App. 3d at 863, 920 N.E.2d at 1201.[3] For that reason, the court rejected the claim that

---

[3] Salgado points out that the appellate court did not cite any case law to support its conclusion that Navarro had not been illegally arrested. In the 2006 opinion, however, the court cited *Florida v. Bostick*, 501 U.S. 429, 437 (1991), for the principle that a seizure occurs at the moment when, in light of all the circumstances surrounding the encounter, police conduct would have communicated to a reasonable person that he was not free to go about his business. *Salgado*, No. 1-03-1753, at 13. The appellate court's 2009 analysis and conclusion that, based on the totality of the circumstances, Navarro was not under arrest at the time he gave his statement does not contradict this standard. *Cf. Early v. Packer,* 537 U.S. 3, 8 (2002) (a state court decision is not contrary to federal law under section 2254(d) just because it failed to cite controlling Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them.").

Navarro's statement could not serve as an intervening factor to attenuate Salgado's confession from his illegal arrest.

The state appellate court went on to evaluate Salgado's arguments that the other *Brown* factors weighed against a finding of attenuation. The court acknowledged Illinois case law suggesting that the giving of *Miranda* warnings could cut either way: it could mean that the defendant was informed of his rights and voluntarily waived them, or it could function as an interrogation technique that indicates to the defendant that questioning will not stop until he confesses. The court found that, in Salgado's case, the giving of *Miranda* warnings prior to his confession weighed in favor of attenuation because he was not repeatedly interrogated and given *Miranda* warnings during the thirty-six hours between when he arrived at the police station and when he gave the first inculpatory statement to police at 9:00 a.m. on February 5. The court then evaluated the detectives' treatment of Salgado over the course of his detention and determined that there was no purposeful or flagrant police misconduct. Lastly, the court considered the timing of all relevant events occurring between when Salgado arrived at the police station and when he gave the videotaped statement on February 5. In light of the length of his detention and the chronology of the various interrogation sessions, the court concluded that the passage of time weighed in favor of attenuation in Salgado's case because he had "adequate time to consider the situation and his decision to make the incriminating statements." *Id.* at 868, 920 N.E.2d at 1205. Based on the totality of the circumstances, including the four *Brown* factors, the court concluded that Salgado's confessions were sufficiently purged of the taint of his illegal arrest and were thus admissible against him at trial.

The contention that the state court courts reached the wrong conclusion on attenuation is insufficient to warrant relief on a habeas corpus petition. *See, e.g.*, *Monroe*, 712 F.3d at 1114 ("It takes more than an error in the state court's analysis to surmount the *Stone* bar to collateral relief . . . ."); *U.S. ex rel. Trevino v. Hardy*, No. 11 C 835, 2011 WL 4496224, at *5 (N.D. Ill. Sept. 27, 2011) ("[T]he inquiry is whether the petitioner received a full and fair hearing, not whether the result of that hearing was correct."). Because the state courts thoroughly analyzed the facts and applied the correct constitutional standards in reaching their conclusion, Salgado is barred by *Stone v. Powell* from raising this claim again on habeas corpus review.

## Conclusion

For the foregoing reasons, the Court denies Salgado's petition for a writ of habeas corpus [dkt. no. 1]. The Court declines to issue a certificate of appealability because he has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Lastly, the Court grants Salgado's request for a copy of the civil docket [dkt. no. 13] and directs the Clerk to provide him with a copy of the docket.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 31, 2018